JASON W. DOMYAN,

      Plaintiff,

                              Case No. 2:18-cv-642

    v.

                              Chief Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

## OPINION AND ORDER

Plaintiff, Jason W. Domyan, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. With the consent of the parties (ECF Nos. 13, 14), 28 U.S.C. § 636(c), this matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 17), and the administrative record (ECF No. 21). Plaintiff did not file a Reply. Because the Court is able to make a determination based on the memoranda and administrative record, Plaintiff's request for oral argument is **DENIED**. For the reasons that follow, the decision of the Commissioner is **REVERSED** and this action is **REMANDED** under Sentence Four of § 405(g).

## I. BACKGROUND

In December 2014, Plaintiff filed applications for disability insurance benefits, alleging that he had been disabled since November 22, 2014. (R. at 222–23.) Plaintiff's application was denied initially and upon reconsideration. (R. at 115–30.) Plaintiff sought a *de novo* hearing

before an administrative law judge.  (R. at 131–36.)  Administrative Law Judge ("ALJ") Jeffrey P. La Vicka held a hearing on May 4, 2017, at which Plaintiff, who was represented by counsel, appeared and testified.  (R. at 50–76.)  On July 10, 2017, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 15–30.)  On May 4, 2018, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1–3.)  Plaintiff then timely commenced the instant action.

## II.    RELEVANT HEARING TESTIMONY

Plaintiff testified at the administrative hearing on May 4, 2017, that he lives with his mother.  (R. at 52.)  Plaintiff has a driver's license and drives an average of four days per week.  (R. at 53–54.)  He drives to work, the grocery store, and Lowes.  (R. at 54.)  Plaintiff drove alone to the hearing, which took just over an hour and a half.  (*Id*.)  Plaintiff testified that he had some anxiety attacks and crying fits on the way to the hearing, which he said is typical when he is driving.  (R. at 70.)

Plaintiff has a Bachelor of Science degree and a Master's degree in physical therapy.  (R. at 58.)  Plaintiff has approximately $100,000 in student loans.  (R. at 58–59.)  Plaintiff receives food stamp assistance.  (R. at 59.)

Plaintiff currently works in retail at MC Sports.  (R. at 55–56, 59–60.)  Plaintiff waits on the public, stocks shelves (pallet to shelf, shelf to pallet), sweeps floors, takes out the trash, counts inventory and firearms, puts firearms away at night, selling firearms and ammunition, and maintains a knowledge base of all related products.  (R. at 55–56, 60, 64.)  Plaintiff testified that he tries to be a good customer service representative and a good team player who gets along with fellow employees.  (R. at 60.)  Plaintiff testified that he worked at MC Sports for approximately

nine months and that it is closing at the end of the week. (R. at 60–61.) Prior to working at MC Sports, Plaintiff worked at a different sporting goods store and was terminated from that position, which is when he received unemployment benefits. (R. at 61.) At that job, he was performing the same duties as he did at MC Sports. (*Id*.)

Prior to those retail jobs, he worked for approximately eight months as a part-time physical therapist at the Medisys Health. (*Id*.) His job duties were, negotiating the routes of each patient's home, going to the home, evaluating the patient, establishing a plan of care, providing a plan of care, making adjustments to the plan of care, "assessing the advocacy [sic] of the plan of care," and documenting everything. (R. at 61–62.) Prior to that job, he worked for approximately a year as a full-time physical therapist for Onward Healthcare. (R. at 62.) In total, he worked as a physical therapist between 2001 and 2011. (R. at 63.) Plaintiff believes that he was a good physical therapist. (R. at 71.) Other than retail and physical therapy, Plaintiff had no other full-time jobs since 2002. (R. at 63.)

Plaintiff has had problems working part-time at MC Sports, including pain in his low back and legs and muscle weakness. (R. at 71.) According to Plaintiff, his mental health problems affect his ability to do his job at MC Sports because the more anxious he gets, the more physical pain and fatigue he feels. (*Id*.) Plaintiff testified that it did not matter if the task was interacting with customers or stocking a shelf, if his name is associated with completion of a task, he has a high level of anxiety. (*Id*.) He worries that if he does not do the task correctly, he will be berated or mocked or fired. (*Id*.) For example, when he is responsible for the firearms, he will re-check and count the guns multiple times and check the lock multiple times. (R. at 72.) This re-checking happens multiple times "with everything." (R. at 73.)

Plaintiff tried to start a home business selling holsters that he made out of plastic for firearms, phones, and tools.  (R. at 54–56.)  Plaintiff uses a belt sander, bolt saw, hand sanding devises, heat guns and a drill press.  (R. at 55.)  Plaintiff relies on word of mouth to sell his products and markets his products to customers when he is working his retail job.  (R. at 55–57.)  He last sold a firearm holster three weeks ago to one of his father's friends.  (R. at 55, 57.)  Plaintiff's business is not incorporated but is considered a cash-generating hobby even though he is "well in the red."  (R. at 55.)  However, Plaintiff testified that the business failed because he was unable to keep up with it.  (R. at 55, 57.)  He became too anxious and felt a lot of responsibility about each product, rechecking and remeasuring, that it became unbearable.  (R. at 73.)

Plaintiff prepares microwaved meals and makes sandwiches.  (R. at 65.)  He also goes shopping approximately once a week with his mother.  (*Id*.)

Plaintiff testified that he performs some household chores, including loading and unloading the dishwasher, sweeping the floor once every two weeks, and doing his own laundry three times a week.  (R. at 65–66.)  Plaintiff plays videogames for approximately one and a half hours per week.  (R. at 66.)  Plaintiff testified that he watches movies but has a hard time watching them because of his attention problems.  (R. at 75.)

Plaintiff testified that his anxiety is the condition that most interferes with his ability to work.  (R. at 63.)  Plaintiff has called off work for mental health problems, including a panic attack.  (R. at 73–74.)  At MC Sports, Plaintiff called off work on average once a month and, "when things were bad," about once or twice a month.  (R. at 74.)  Plaintiff did not get written up for that because they said they understood.  (*Id*.)  Plaintiff has an anxiety attack three to five times daily and panic attacks at least once a month, sometimes once every couple of days,

depending on stimulators. (R. at 75–76.) Plaintiff testified as to the difference between the kinds of attacks, testifying that he was currently having an anxiety attack but still lucid, able to answer questions, and process what is going on around him. (R. at 75.) With panic attacks, Plaintiff has lost bowel and bladder control, has no control over what he says, sweats profusely, and vomits. (R. at 75–76.)

Plaintiff takes Valium PRN for his anxiety, a side effect of which is fatigue. (R. at 64.) He also takes Trazadone, Adderall, and Latuda. (R. at 69.) Plaintiff lives in Ohio but sees a psychiatrist, Dr. Sofdar Chaudhary, in Pennsylvania by telephone or Skype approximately once a month. (R. at 68–69.) Plaintiff used to live in Pennsylvania and believes that Dr. Chaudhary was the first and only person to give him help. (R. at 69.) Plaintiff testified that Dr. Chaudhary had a approach different than simply prescribing drugs and "it worked. I developed a trust in him. And in comparison to the others I've seen prior to him, they weren't effective. He was." (*Id.*)

### III.    RELEVANT MEDICAL RECORDS

#### A.    Emergency Department

On December 17, 2016, Plaintiff presented to the emergency department of East Ohio Regional Hospital for evaluation following a fall. (R. at 609–12.) Plaintiff reported that he fell that day and did not remember the fall and was not sure if he hit his head or blacked out. (R. at 609.) Plaintiff said he has a bruise on his head and was not sure how he got it. (*Id.*) Plaintiff complained that his lower back was hurting more than normal and that he had left elbow pain. (*Id.*) Plaintiff reported that he could move both of his shoulders without any difficulty but that his lower lumbar pain was worse than normal. (*Id.*) A physical examination revealed Plaintiff lying comfortably in bed in no acute distress. (R. at 610.) Examination also revealed tenderness

to palpation in lower back paralumbar spinal muscle, but Plaintiff demonstrated five out of five strength in all four extremities, full range of motion of the back and neck, and intact sensation in all four extremities.  (R. at 610–11.)

A CT scan was ordered on December 17, 2016, with the notation that Plaintiff "does seem to be a poor historian."  (R. at 611.)  X-rays of Plaintiff's lumbar spine, elbow, and left foot were also ordered, which demonstrated no acute clinical findings.  (*Id.*)  "All imaging demonstrated no concerning findings for fractures.  No bleeding in the brain was noted."  (*Id.*)  Specifically, imaging of the lumbar spine revealed normal alignment and bony mineralization and intact vertebral bodies and intervertebral disc spaces.  (R. at 583.)  The CT scan of Plaintiff's cervical spine demonstrated C5-6 and C6-7 slight degenerative intervertebral disc space narrowing but no significant canal stenos or evidence of gross cord compromise.  (R. at 580, 614.)  It was determined that Plaintiff did not require any further testing.  (R. at 614.)  The clinical impression was musculoskeletal pain following his fall.  (R. at 611.)  Plaintiff was discharged in stable condition and directed to follow up with his primary care provider.  (*Id.*)

On December 17, 2016, the emergency room physician released Plaintiff to return to work with no stairs, no heavy lifting, no running, and light duty only as of December 19, 2016.  (R. at 616.)

On December 27, 2016, Plaintiff presented to the emergency department of East Ohio Regional Hospital for evaluation for possible cellulitis.  (R. at 618–19.)  Plaintiff reported that he had recently injured his leg and was doing physical therapy.  (R. at 618.)  Plaintiff reported that he was sitting at work the day before on light duty and noticed increased swelling today.  (*Id.*)  Plaintiff reported some chills at home be denied other associated signs or symptoms.  (*Id.*)  The

emergency room physician released Plaintiff to return to work with no stairs, no heavy lifting, no running, and light duty only as of December 29, 2016.  (R. at 615.)

**B.      Sarah Taylor, D.O. and Radiology Reports**

On August 30, 2016, Plaintiff presented to Sarah Taylor, D.O., to establish care.  (R. at 813–19.)  Upon examination, Plaintiff was alert, oriented, and in no acute distress.  (R. at 817.) He had bilateral tenderness in the paraspinous muscles, but had normal upper and lower extremity strength, normal range of motion, normal reflexes, and a normal gait.  (R. at 818.)  Dr. Taylor's assessment was chronic bilateral thoracic hack pain, generalized weakness, dizziness, morbid obesity, myalgia, and multilevel spine pain.  (*Id*.)  Dr. Taylor reported that Plaintiff had multiple neurological complaints, but no obvious localizing features.  (R. at 819.)  Dr. Taylor ordered x-rays and physical therapy and directed Plaintiff to follow up in four to six weeks.  (*Id*.)

Plaintiff presented to Dr. Taylor for follow up of back spasms, pain, general weakness, and nausea symptoms on October 21, 2016.  (R. at 808–12.)  Upon examination, Plaintiff was alert and in no acute distress.  (R. at 811.)  Dr. Taylor assessed lung nodule seen on imaging study, myalgia, multilateral spine pain, chronic bilateral thoracic hack pain, dizziness, generalized weakness, and mixed hyperlipidemia.  (R. at 812.)  Dr. Taylor ordered a MRI and noted that Plaintiff may need a CT scan for the spot seen in the thoracic x-ray and that Plaintiff may need to consider neurology, pain management, or other neuro services, if needed.  (*Id*.)

In November 2016, a MRI of the cervical spine without contrast revealed a small broad based disc-osteophyte complex with slight spinal canal stenosis at C4-5 and C5-6 and slight reversal of the curvature.  (R. at 584.)

On December 29, 2016, Dr. Taylor released Plaintiff to return to work on January 3, 2017, noting that Plaintiff had been under care since December 29, 2016.  (R. at 620.)

On January 4, 2017, Plaintiff presented for follow up with Dr. Taylor, complaining that he had been seen in the emergency room the week before after having an episode of sudden reported weakness in the legs, a fall forward and head injury on his front steps. (R. at 802–07.) Plaintiff reported that he was passed out and woke up and was in severe pain that he was vomiting and had a difficult time standing up. (R. at 805.) According to Plaintiff, he tried to notify his mother who did not immediately respond but who eventually took him to the emergency room. (*Id.*) Plaintiff also complained of cellulitis and abnormal gait, helped with assistive device. (*Id.*) Upon examination, Plaintiff was alert and in no acute distress. (R. at 806.) Plaintiff had normal range of motion in his neck. (R. at 806.) Dr. Taylor assessed as Plaintiff's current problems a concussion with loss of consciousness of unspecified duration, left leg cellulitis, chronic bilateral thoracic back pain, and generalized weakness. (R. at 807.) Dr. Taylor noted that the CT scan from Plaintiff's emergency room visit did not show any obvious acute concerning findings. (*Id.*) Dr. Taylor opined as follows:

> Patient likely had a concussion and continues to have postconcussive symptoms including foggy headedness with occasional disorientation, and fatigue. Although some of the symptoms may have been somewhat chronic for him. Discussed this may take time to resolve. He should not do excessive mental or physical activity at this time and slowly improved. He will finish out antibiotics cellulitis appears to be improving. He seems to be tolerating the pain with the help of the Robaxin will continue at this time. He will be following up in another week to week and a half with neurology and should bring up concussion with them as well. Discussed if perineal symptoms returned this needs to be evaluated right away. We'll continue to follow.

(*Id.*)

On January 20, 2017, Plaintiff returned for follow up with Dr. Taylor, complaining of not sleeping or eating for the last three days and complaining of anxiety. (R. at 797–801.) Plaintiff complained that since his head injury he has been having severe worsening anxiety symptoms, memory symptoms, and feeling very unwell generally. (R. at 800.) Upon examination, Plaintiff

was alert and oriented.  (*Id*.)  Dr. Taylor noted a grossly normal mental state and judgment and an anxious affect.  (*Id*.)  Dr. Taylor assessed Plaintiff's current problems as a concussion, with loss of consciousness of unspecified duration, and anxiety.  (R. at 801.)  Dr. Taylor reviewed and updated Plaintiff's medications.  (*Id*.)  Dr. Taylor noted that Plaintiff should reduce his workload and mental and physical exertion for the next few weeks until things improve.  (*Id*.)  Dr. Taylor also noted that Plaintiff may need medication adjustment to psychiatry.  (*Id*.)

On February 14, 2017, Plaintiff presented to Dr. Taylor for follow up, complaining of dizziness, nausea, and loss of appetite and with questions about disability.  (R. at 792–96.)  Plaintiff reported concern for stress and reported that he was having a difficult time working day in and day out because of pain, fatigue, and muscle fatigue.  (R. at 795.)  Upon examination, Plaintiff was alert and oriented with an anxious affect and grossly normal judgment.  (R. at 795– 96.)  Dr. Taylor noted that Plaintiff's symptoms may be related to exacerbation with concussion and that Plaintiff will continue to keep appointments with his psychiatrist.  (R. at 796.)  Dr. Taylor also noted the following:  "Did discuss that there is a chance that long-term work is not a good option for him since especially cannot seem to be able to tolerate a full time job.  That disability maybe his ultimate choice.  Patient reports understanding will follow."  (*Id*.)

On March 3, 2017, Dr. Taylor provided the following statement:

Mr. Jason Domyan, dob 05/22/75 has been a patient of mine now for several months at my Family Practice office.  He has a long history of anxiety, depression, and musculoskeletal weakness and fatigue.  He has been undergoing evaluation and has also been found to have stroke like chronic findings that likely exacerbate his anxiety and depression history and possibly his other symptoms.  He is currently being managed by several specialists including Neurology, Psychiatry, and Physical Therapy, and myself, and potentially will need other evaluation.  He will likely need to maintain treatment through all of these avenues lifelong. Unfortunately, it is unlikely that the patient's chronic issues with completely resolve, and symptom management is highly related to stressors and activity.  In my professional opinion, the patient's ability to hold a full time or likely even part time job in a dependable manner without significant frequent and/or intermittent

absences is unlikely.  I believe he should be considered for full disability due to these concerns.

(R. at 709.)

## C.    Safdar I. Chaudhary, M.D.

Plaintiff was first seen by Safdar I. Chaudhary, M.D., his treating psychiatrist, on March 28, 2006, and presents to Dr. Chaudhary every two weeks to every two months for medication management appointments.  (R. at 533.)

On September 4, 2014, Dr. Chaudhary spoke with Plaintiff, and summarized as follows:

pt feeling very anxious, having difficulty with his part time position that he was actually hired as part time and he feels they continually ask him to do more time, and even after he tells them no.  they continue calling and asking several more times.  he feels that he may "break" if they "bully" him.  Consulted with Dr. Chaudhary and letter written stating pt should work no more than 18 to 20 working units in a week (part time). . . .

(R. at 428.)  In the letter, Dr. Chaudhary specifically stated as follows:

Jason (DOB 05/22/1975) is under our care at this office for treatment of a Psychiatric condition.  Our office is requesting that this patient not exceed 18 to 20 units / hours of work per week.  Exceeding this set limit may exacerbate the patient's current condition resulting in further limitations.

Please feel free to contact me if you should have any further questions or needs at 724-468-3999.

(R. at 577.)

On April 28, 2015, Dr. Chaudhary completed a mental medical source statement.  (R. at 533–38.)  Dr. Chaudhary opined that Plaintiff was seriously limited in his ability to maintain attention for two-hour segments, sustain an ordinary routine without special supervision, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically-based symptoms, respond appropriately to changes in a routine work setting, understand and remember detail instructions, and set realistic goals or make plans

independently of others.  (R. at 535–36.)  Dr. Chaudhary further opined that Plaintiff was unable to meet competitive standards in his ability to perform at a consistent pace without an unreasonable number and length of rest periods, deal with normal work stress, and deal with stress of semi-skilled and skilled work.  (*Id*.)  Dr. Chaudhary also opined that Plaintiff had no useful ability to function to use public transportation.  (R. at 536.)  According to Dr. Chaudhary, Plaintiff was seriously limited in his ability to maintain socially appropriate behavior and that he was unable to meet competitive standards in his ability to interact appropriately with the general public and ability to travel in unfamiliar place.  (*Id*.)  Dr. Chaudhary went on to opine that Plaintiff's psychiatric condition exacerbates his pain or other physical symptoms "when patient is in stressful situations or under any stress at all, he has reoccurring low back pain that radiates down to bilateral ankles.  Stress definitely exacerbates his physical back pain."  (*Id*.)  Dr. Chaudhary also opined that Plaintiff would be absent from work for more than four days per month due to his impairments or treatment.  (R. at 537.)  In response to the request to describe "any additional reasons not covered above why your patient would have difficulty working at a regular job on a sustained basis[,]" Dr. Chaudhary stated that Plaintiff had an "inability to interact with others without extreme stress & psychological difficulties."  (*Id*.)

In a letter dated April 18, 2016, Dr. Chaudhary wrote a letter, opining as follows:

> Jason is under our care at this office for treatment of Bipolar Disorder (296.60) and Obsessive Compulsive Disorder (300.3).  Our office is requesting that patient does not exceed 18 to 20 units of work per week.  Exceeding the set limits may exacerbate patients current condition resulting in further limitations.  Please feel free to contact me if you have further questions at (724) 468-3999.

(R. at 576.)

**D.    Gabriel Sella, M.D.[1]**

On February 24, 2015, Gabriel Sella, M.D., performed a consultative examination.  (R. at 500–09.)  Upon examination, Plaintiff walked in and out of the office without difficulty and without the use of a cane.  (R. at 502.)  Plaintiff got on an off the exam table and dressed and undressed without difficulty.  (*Id*.)  Plaintiff's tip toe and heal walking was normal as was his standing and straight leg raising test.  (R. at 503.)

Although Dr. Sella noted that Plaintiff appeared be very anxious or tense, he also noted that Plaintiff had normal judgment, insight, and memory, as well as mental status.  (R. at 502.)  Dr. Sella noted that "[w]ith regards to the anxiety & depression, he is credible.  I have no medical/psychiatric evidence."  (R. at 503.)  Plaintiff reported to Dr. Sella that Plaintiff's limp pain and spasm increase in relation to his anxiety and overall tension.  (*Id*.)  However, "[c]linically, there was no hypertonus in any limb muscle during the exam.  That does not include the fact there could be spasm if he is very anxious or tense."  (*Id*.)  Imaging of the lumbar spine revealed narrowing of the L1-2 disc space, Schmorl's nodes at the superior and inferior endplates of T12 and L1 and superior endplate of L2 as well as small marginal spurs.  (R. at 505.)  Plaintiff was assessed with degenerative changes in the upper lumbar spine.  (*Id*.)

Dr. Sella noted that Plaintiff had no joint difficulty in terms of range of motion.  (R. at 503.)  Dr. Sella specifically reported that Plaintiff had normal grip strength, normal range of motion of the neck, normal motor examination, normal sensation, normal reflexes, normal squatting, normal hopping, and normal standing straight leg raising.  (R. at 506–09.)  Dr. Sella opined as follows:

---

[1] The ALJ refers to this Dr. Sella as "Gabriella" Sella (R. at 22) but the medical records reflect a name of "Gabriel" Sella (*see*, *e.g.*, R. at 500, 504.)

According to your request, without the presence of objective history/x-rays/testing evidence, the presumptive diagnoses based on the history and physical exam alone are as follows: severe history of anxiety/depression with probable somatization to the muscle system and chronic use of valium.

At present, Mr. Domyan can perform the following work related activities: sitting without restrictions, standing & walking 5 minutes at one time several times a day, lifting & carrying light weights, handling light weight objects, hearing, speaking and traveling.

(R. at 504.)

## III. ADMINISTRATIVE DECISION

On July 10, 2017, the ALJ issued his decision. (R. at 15–30.) The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2020. (R. at 17.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff may have engaged in substantial gainful activity subsequent to his alleged onset date. (R. at 18.) The ALJ stated that these earnings would render Plaintiff ineligible for and/or barred from disability insurance benefits for some or all of the period at issue. (*Id.*) However, giving

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Plaintiff the benefit of the doubt, the ALJ went on to consider the medical evidence to determine the Plaintiff's eligibility for benefits during the period at issue and made no further dispositive findings with regard to the Plaintiff's work activity since November 22, 2014 absent a conclusion hereinafter that Plaintiff had been under an otherwise compensable "disability" during the period at issue. (*Id.*)

At step two, the ALJ concluded that Plaintiff had the following severe impairments: cervical spine, thoracic spine, and lumbar spine degenerative disc disease; obesity; affective disorder; and anxiety. (R. at 18.)

At step three of the sequential process, the ALJ concluded that that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) At step four, the ALJ assessed Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except work must: allow the claimant to change between sitting and standing for up to two minutes at thirty minute intervals without going off task; entail no climbing of ladders, ropes, or scaffolds and only occasional other postural movements (i.e. climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling); avoid concentrated exposure to cold and heat, wetness and humidity, and vibration; avoid all exposure to unprotected heights, hazardous machinery, and commercial driving; be limited to simple, routine, and repetitive tasks requiring only simple decisions, with no fast-paced production requirements and few work place changes; entail no interaction with the public and only occasional interaction with co-workers and supervisors.

(R. at 20–21.) In reaching this determination, the ALJ assigned little weight to the opinions of Drs. Stella, Chaudhary, and Taylor. (R. at 25–27.)

Relying on the VE's testimony, the ALJ determined that Plaintiff can perform jobs that exist in significant numbers in the national economy. (R. at 28–29.) He therefore concluded that

Plaintiff was not disabled under the Social Security Act from November 22, 2014 through the date of the decision. (R. at 29.)

## IV. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant

of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V.    ANALYSIS

Plaintiff advances one contention of error with sub-parts.  Plaintiff contends that the ALJ erred when evaluating the opinions of treating physician Dr. Taylor, treating psychiatrist, Dr. Chaudhary, and a consultative examiner, Dr. Sella.  (ECF No. 12 at 3–19.)  Specifically, Plaintiff contends that the ALJ did not provide good reasons for the weight assigned to the opinions of Drs. Taylor and Chaudhary and failed to fairly consider the various factors outlined in 20 C.F.R. § 404.1527(c) when assessing those opinions.  (*Id.*)  Plaintiff also argues that the ALJ erred in assessing Dr. Sella's opinion by, *inter alia*, failing to recognize Dr. Sella as a "double expert." (*Id.*)  The Court first addresses Plaintiff's arguments regarding Dr. Chaudhary, which it finds meritorious.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ."  20 C.F.R. § 416.927(c)(2).  "An ALJ is required to give controlling weight to 'a treating source's opinion on

the issue(s) of the nature and severity of [the claimant's] impairment(s) 'if the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (alterations in original); *see also Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009) (explaining the "treating physician rule").

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician

rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, the ALJ considered Dr. Chaudhary's opinions and assigned them "little weight," reasoning as follows:

> On September 4, 2014, S. Chaudhary, M.D. wrote a letter stating the claimant should work no more than 18 to 20 working units a week. Exhibit 2F/16 and Exhibit 6F. Dr. Chaudhary again opined that the claimant should not exceed 18 to 20 units of work per week. Exhibit 6F. These assessments are not particularly probative in this case because he has not offered any specific functional limitations, but rather offered an opinion on restrictions regarding the claimant's current employment, which as indicated above, exceeds the limitations set forth in the above residual functional capacity. Therefore, the undersigned affords little weight to these opinions as the provide no insight into the development of a maximum residual functional capacity.

(R. at 25.)

On April 28, 2015, Dr. Sofdar Chaudhary completed a mental medical source statement. Dr. Chaudhary opined that the claimant was seriously limited in ability to maintain attention for two hour segments, sustain an ordinary routine without special supervision, make simple work-related decision, complete a normal workday and workweek without interruptions from psychologically based symptoms, respond appropriately to changes in a routine work setting, understand and remember detail instructions, and set realistic goals or make plans independently of others. He opined that the claimant was unable to meet competitive standards in ability to perform at a consistent pace without an unreasonable number and length of rest periods, deal with normal work stress, and deal with stress of semi-skilled and skilled work. He opined the claimant had no useful ability to function to use public transportation. He opined the claimant was seriously limited in ability to maintain socially appropriate behavior. He opined the claimant was unable to meet competitive standards in ability to interact appropriately with the general public and ability to travel in unfamiliar place. Exhibit 4F. Dr. Chaudhary opined that the claimant's psychiatric condition exacerbates the claimant's pain or other physical symptoms, "when patient is in stressful situations or under any stress at all, he has reoccuring low back pain that radiates down to bilateral ankles. Stress definitely exacerbates his physical back pain." He further opined that the claimant would be absent from work for more than four days per months due to his impairments or treatment. He further opined the claimant had an inability to interact with others without extreme stress and psychological difficulties. Exhibit 4F. Overall, the longitudinal medical evidence of record does not support the severity of limitations opined by Dr. Chaudhary. The longitudinal record indicates that the claimant has sought no more than conservative mental health treatment throughout the period at issue. Additionally, Dr. Chaudhary's opinion is more than two years old and subsequent treatment records from the Claimant's primary care physician indicates the claimant's mental status was grossly normal, affect was normal, and judgment was grossly normal and that he was pleasant and cooperative. Additionally, the claimant's mental health treatment records consistently indicated that the claimant had fair spontaneous conversation, only mildly impaired concentration, grossly intact long and short-term memory, and fair insight and judgment. Exhibit 15F. Therefore, the undersigned finds that the longitudinal medical records do not support the serious limitations on opinions with an inability to perform limitations assessed by Dr. Chaudhary. Furthermore, the records do not support Dr. Chaudhary's assessment regarding the claimant's absence from work. In fact, the claimant's earnings records indicate that subsequent to his assessment there were period in which the claimant exceeded substantial gainful activity level employment. Accordingly, the undersigned afford little weight to the opinions of Dr. Chaudhary and finds the above residual functional capacity more than accommodates any limitations the claimant may experience due to his mental health conditions.

(R. at 26.)

Turning first to the ALJ's assessment of Dr. Chaudhary's medical source statement from April 2015 ("April 2015 opinion"), the Court finds that the ALJ did not provide good reasons for rejecting this opinion. As a preliminary matter, the ALJ discounted Dr. Chaudhary's April 2015

opinion because it was "more than two years old[.]"  However, as Plaintiff points out (ECF No.
12 at 17–18), the ALJ gave "significant weight" to the state agency consultants' mental
assessments even though those opinions were also issued in 2015.  (R. at 28, 81–94 (opinion of
Karen Terry, Ph.D., dated February 17, 2015), 95–109 (opinion of Melanie Bergsten, Ph.D.,
dated May 17, 2015).)  "It is error for an ALJ to more strictly scrutinize the opinion of a treating
physician."  *Worden v. Comm'r of Soc. Sec.*, No. 3:14-cv-438, 2016 WL 860694, at \*5 (S.D.
Ohio Mar. 7, 2016) (reversing non-disability finding) (citing *Gayheart v. Comm'r of Soc. Sec.*,
710 F.3d 365, 379 (6th Cir. 2013) (stating that "[a] more rigorous scrutiny of the treating-source
opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis
that the regulation[s] require"); *see also McCain v. Comm'r of Soc. Sec. Admin.*, No. 3:17-cv-
402, 2019 WL 1449740, at \*6 (S.D. Ohio Apr. 2, 2019) (recommending non-disability finding be
remanded where, *inter alia*, "the ALJ erred by failing to apply the same level of scrutiny to
reviewing physicians' opinions as he applied to treating source's opinion" when he criticized the
plaintiff's treating physician's opinion "because it was not supported by any other treating
clinician's opinion" but did not discount "the State agency physicians' opinions because they
were not supported by a treating clinician's opinion"), *recommendation adopted by* 2019 WL
1674287 (S.D. Ohio, Apr. 17, 2019).

The ALJ also discounted Dr. Chaudhary's April 2015 opinion because the longitudinal
medical record did not support the severity of Dr. Chaudhary's limitations where, *inter alia*,
"subsequent treatment records from the claimant's *primary care physician* indicates [sic] the
claimant's mental status was grossly normal, affect was normal, and judgment was grossly
normal and that he was pleasant and cooperative."  (R. at 26 (emphasis added).)  This proffered
reason does not constitute "good reasons" for discounting Dr. Chaudhary's April 2015 opinion.

Notably, the ALJ failed to acknowledge Dr. Chaudhary's specialization in mental health and psychology, instead relying heavily on normal findings documented by Plaintiff's primary care physician in progress notes to discount Dr. Chaudhary's clinical findings. *See Grames v. Comm'r of Soc. Sec.*, No. 18-1568, 2019 WL 1007845, at *2 (6th Cir. Mar. 1, 2019) (remanding where, *inter alia*, the ALJ failed to consider factors under § 404.127, including treating physician's specialization); *see also Spurlock v. Comm'r of Soc. Sec.*, No. 1:18-cv-404, 2019 WL 3368619, at *8 (S.D. Ohio July 25, 2019) (recommending remand where, *inter alia*, "the Court finds it significant that the ALJ failed to consider Dr. Schroder's specialization in mental health and psychology and instead heavily relied on the 'normal mental status findings documented through the pain management progress notes' to discount Dr. Schroder's clinical findings"), *recommendation adopted by* 2019 WL 3944957 (S.D. Ohio Aug. 21, 2019); *Bartunek v. Berryhill*, No. 3:16-cv-326, 2017 WL 3642338, at *7 (S.D. Ohio Aug. 24, 2017) (remanding where, *inter alia*, the ALJ did not recognize the treating physician's specialty and stating that "[by] ignoring the factors, ALJ Statum did not apply the correct legal criteria and failed to give Dr. Donnini the deference he deserved as a treating physician") (citing 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.")); *Ridout v. Comm'r of Soc. Sec.*,, No. 3:15-cv-99, 2016 WL 1178017, at *6 (S.D. Ohio Mar. 28, 2016) (remanding where, *inter alia*, in weighing the treating physician's opinion, "the ALJ failed to acknowledge his specialization as a neurosurgeon — which particularly concerns the Court given the ALJ's reliance on the opinion of a record-reviewing dermatologist, *i.e.*, a specialty wholly inapplicable to Plaintiff's impairments").

The ALJ also concluded that the longitudinal medical record did not support the severity of Dr. Chaudhary's limitations because Plaintiff's mental health treatment records indicated that the claimant had fair spontaneous conversation, only mildly impaired concentration, grossly intact long and short-term memory, and fair insight and judgment. (R. at 23, 26 (citing Exhibit 15F (Dr. Chaudhary's records).) A review of these records, however, belies the ALJ's representation of this evidence. At the same appointments in 2016 and 2017 where Dr. Chaudhary noted that Plaintiff had fair spontaneous conversation, only mildly impaired concentration, grossly intact long and short-term memory, and fair insight and judgment, he also noted an anxious and depressed mood, angry and fearful mood, an anxious affect, guilty ruminations, and recent passive death wishes. (R. at 710–39.) In addition, although the ALJ stated that the assessment in these records was posttraumatic stress disorder (*see* R. at 23 (citing Exhibit 15F)), these records reflect that Dr. Chaudhary also diagnosed Plaintiff with depressed mood and bipolar 2 disorder. (R. at 713, 715, 717, 719.) "An ALJ's decision cannot be upheld where she 'selectively considered the evidence in denying benefits.'" *Grames*, 2019 WL 1007845, at *2 (stating that "the ALJ simply cherry-picked certain observations and medical findings while ignoring other serious symptoms that Dr. D'Mello and other practitioners noted throughout the relevant time-period") (quoting *Howard v. Barnhart*, 376 F.3d 551, 554 (6th Cir. 2004)); *cf. See Wilson*, 378 F.3d at 544 (stating that "supportability of the opinion" is a factor to consider where an ALJ does not give a treating source's opinion controlling weight); *Burnett v. Berryhill*, No. 3:16-cv-479, 2018 WL 840121, at *2 (S.D. Ohio Feb. 13, 2018) ("Thus, the ALJ's conclusion that Dr. White's opinion was not well-supported was belied by the evidence of record, and the ALJ's failure to determine whether to assign controlling weight to that opinion is reversible error.") (citing *Gayheart*, 710 F.3d at 377).

In addition, as Plaintiff points out (ECF No. 12 at 10–12), Dr. Chaudhary's April 2015 opinion is consistent with the opinions and records of Drs. Taylor and Sella, the only other physicians who actually examined Plaintiff and offered an opinion. (*Compare, e.g.*, R. at 535–36 (Dr. Chaudhary noting that "Pt experiences difficulty with above areas due to his clinical depression symptoms listed under #5" and "[w]hen pt. is in stressful situations or under any stress at all, he has reoccurring low back pain that radiates down to bilateral ankles. Stress definitely exacerbates his physical back pain") *with* 503 (Dr. Sella noting that Plaintiff is credible as to his anxiety and depression and that "[c]linically, there was no hypertonus in any limb muscle during the exam. That does not exclude the fact that there could be spasm if he is very anxious or tense"), and 709 (Dr. Taylor stating that Plaintiff "will likely need to maintain [mental health] treatment through all of these avenues lifelong. Unfortunately, it is unlikely that the patient's chronic issues with [sic] completely resolve, and symptom management is highly related to stressors and activity").) This consistency further undermines the ALJ's decision to award "little weight" to Dr. Chaudhary's opinion. *See Wilson*, 378 F.3d at 544 (stating that "consistency of the opinion with the record as a whole" is a factor to consider where an ALJ does not give a treating source's opinion controlling weight); *Phillips v. Comm'r of Soc. Sec.*, No. 3:16 CV 514, 2017 WL 951422, at *9 (N.D. Ohio Mar. 10, 2017) (stating that "[w]hen an ALJ determines a treating physician's opinion is not entitled to controlling weight, he must provide support to refute either the opinion's objective basis or its consistency with other record evidence" and that "[c]onclusory statements in this regard, however, are not sufficient") (citations omitted); 20 C.F.R. § 404.1527(c)(2) (providing that if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will

give it controlling weight"); *cf.* Social Security Ruling 96-2p ("Even if well-supported by medically acceptable clinical and laboratory techniques, the treating source's medical opinion also must be 'not inconsistent' with the other 'substantial evidence' in the individual's case record."). For all these reasons, the Court finds that the ALJ failed to provide good reasons for discounting Dr. Chaudhary's April 2015 opinion.

However, under some circumstances, a violation of the good reasons rule may constitute "harmless error." *Wilson*, 378 F.3d at 547; *see also Friend*, 375 F. App'x at 552–53 (analyzing whether an ALJ's failure to comply with the good reasons rule amounts to harmless error). The United States Court of Appeals for the Sixth Circuit has found these circumstances existing in the three following scenarios: (1) where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547.

Here, the ALJ's violation of the good reasons rule is not harmless. As to the first circumstance constituting harmless error, the Court cannot conclude that Dr. Chaudhary's April 2015 opinion is patently deficient. The ALJ gave "little weight" to this opinion and therefore did not totally reject it. *Cf. Allen v. Comm'r of Soc. Sec.*, No. 1:13-cv-171, 2014 WL 1093139, at *6 (N.D. Ohio Mar. 17, 2014) ("Here, the ALJ did not totally reject Dr. Svete's opinions by assigning them no weight, but rather he accepted them up to a point, ascribing 'lesser' weight to Dr. Svete's opinion than to the other opinions previously mentioned. In such a case, the 'patently deficient' harmless error exception does not apply."). Moreover, for the reasons previously discussed, Dr. Chaudhary's April 2015 opinion is "not a complete outlier amongst the medical

opinions proffered[,]" *Shields v. Comm'r of Soc. Sec.*, No. 17-6091, 732 F. App'x 430, 440 (6th Cir. 2018); *Miller v. Berryhill*, No. 3:16-cv-00094, 2017 WL 1021313, at *9 (S.D. Ohio Mar. 16, 2017) (concluding that a treating opinion was not patently deficient where the "record contains evidence consistent with [the treating] opinion"); *Congrove v. Comm'r of Soc. Sec.*, No. 2:15-cv-2630, 2016 WL 3097153, at *5 (S.D. Ohio June 3, 2016) ("If treatment notes support the physician's findings, an opinion is not patently deficient."), *recommendation adopted by* 2016 WL 3944485 (S.D. Ohio, July 15, 2016). Accordingly, it cannot be said that Dr. Chaudhary's April 2015 opinion was so patently deficient that the ALJ's failure to properly weigh it constitutes harmless error.

Next, the ALJ did not adopt Dr. Chaudhary's April 2015 opinion or make findings consistent with the opinion. As previously discussed, the ALJ accorded only "little weight" to Dr. Chaudhary's April 2015 opinion. (R. at 26.)

Finally, the Court cannot conclude that the goal of § 1527(d)(2) has been met. With respect to this circumstance, "'the procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments.'" *Shields*, 732 F. App'x at 438 (quoting *Friend*, 375 F. App'x at 551). Here, for the reasons previously discussed, the ALJ improperly selectively considered evidence in Dr. Chaudhary's own notes and other medical evidence in the record that supported the April 2015 opinion, requiring remand. *Id.*; *cf. Rogers*, 486 F.3d at 243 (explaining that a purpose of the good reason rule is to ensure "meaningful appellate review of the ALJ's application of the rule") (internal quotation marks omitted).

For these reasons, Plaintiff's contention of error as to the ALJ's assessment of Dr. Chaudhary's April 2015 opinion is **SUSTAINED**.[3]

## VI. CONCLUSION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence does not support the ALJ's decision denying benefits. Based on the foregoing, the decision of the Commissioner is **REVERSED** and this action is **REMANDED** under Sentence Four of § 405(g). The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

Date: September 16, 2019               _s/ Elizabeth A. Preston Deavers_ _____
                                       ELIZABETH A. PRESTON DEAVERS
                                       CHIEF UNITED STATES MAGISTRATE JUDGE

---

[3] This finding obviates the need to for in-depth analysis of Plaintiff's remaining contentions of error regarding the weight given to the treating and examining health sources. The Court, however, encourages the Commissioner to address these various arguments upon remand.